UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
JUDITH DAY,

              Plaintiff,

     -against-                             **MEMORANDUM & ORDER**

MICHAEL ASTRUE, Commissioner          Civil Action No. 09-131
of Social Security,                         (DRH)

              Defendant.
-----------------------------------------------------X

**APPEARANCES**:

**For Plaintiff**:
Severance, Burko & Spalter, P.C.
16 Court Street, Suite 2800
Brooklyn, New York 11241
By: Louis R. Burko, Esq.

**For Defendant**:
Loretta E. Lynch
United States Attorney for the Eastern District of New York
610 Federal Plaza,
Central Islip, NY 11722
By: Robert B. Kambic, AUSA

**HURLEY, Senior District Judge**:

      Plaintiff Judith Day ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner" or "Defendant") which denied her claim for disability benefits. Presently before

the Court are Defendant's motion and Plaintiff's cross-motion for judgment on the pleadings.

For the reasons discussed below, the decision of the Commissioner is reversed and the matter is

remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.    *Procedural Background*

Plaintiff applied for Social Security disability insurance benefits on July 23, 2003,

alleging disability commencing on September 11, 2001, due to headaches, dizziness, depression,

and anxiety.  (Transcript (hereafter "Tr.") 59-62.)[1]  The claim was denied initially on October 2,

2003.  (Tr. 43-50.)  Plaintiff timely requested a hearing before an administrative law judge

("ALJ") and a hearing was held before ALJ David Nesnewitz on September 20, 2005, with a

supplemental hearing held on April 17, 2006, at which Plaintiff appeared represented by counsel.

(Tr. 599-664, 665-761.)  The ALJ issued a decision on August 17, 2006, finding that Plaintiff

was not disabled within the meaning of the Social Security Act.  (Tr. 24-34.)  Plaintiff requested

review by the Appeals Council ("AC").  (Tr. 8.)   By notice dated November 14, 2008, the AC

denied Plaintiff's request, rendering the ALJ's decision as the "final decision" of Defendant.  (Tr.

6-9.)

## II.    *Factual Background*

### A.    *Non-Medical Evidence*

Plaintiff was born on April 25, 1969, and was thirty-six years old at the time of the

hearings.  (Tr. 667.)  Plaintiff is a college graduate who worked as an office assistant from 1992

to 1994, a data entry operator in 1993, an information systems trainer from 1994 to 1996, and a

computer operator from 1996 to 2001.  (Tr. 85-87, 96-103, 693.)  She is insured for benefits

through December 2007.  (Tr. 74.)

---

[1] Page citations are to the transcript of the administrative record filed by the
Commissioner in this case.

Plaintiff testified that from 1996 to 2001, she worked for Fuji Bank located on the 82nd floor of Two World Trade Center. (Tr. 676.) On the morning of the terrorist attack on September 11, 2001, Plaintiff was working in Fuji Bank's ancillary offices at One World Trade Center and was evacuated from the building. (Tr. 677.) Plaintiff stopped working at Fuji Bank in December 2001 because she became "very sick" after the events of September 11th. (Tr. 679.) She had "problems breathing, migraines, flashbacks, [and] coughing." (Tr. 680.) She next returned to work for less than three months in 2005 as a retail representative but could not handle the stress and pressure of the job, even though she had worked for that company previously from 1999 to 2000. (Tr. 605-07, 693-94.) She testified that she has not looked for employment since that time because she "doesn't want to be bothered by people." (Tr. 699.) Her ability to function depends on "what's in [her] mind, what [she's] thinking, what's getting frustrated. " (Tr. 701). She described her symptoms further as "[w]aking up from a nightmare," "re-living the whole situation[]," and "[t]he smell of burning flesh." (Tr. 701). Because she has trouble sleeping, she cannot focus or concentrate. (Tr. 622.)

Plaintiff testified that on a typical day, she wakes up, eats, showers, watches television, reads, and uses her computer. (Tr. 636-39.) She does her own grocery shopping, cooking, and light cleaning. (Tr 692.) She occasionally goes to church "[w]hen the churches are empty." (Tr. 639.) She has panic attacks at least once a week during which she gets "hot, sweaty, [has] difficulty breathing, [has] bowel movement[s], . . . lose[s] control of [her] legs, and . . . feel[s] like [she's] going to faint." (Tr. 647.) She had a social life prior to September 11th but her post-September 11 behavior caused her and her husband to separate in 2002. (Tr. 651, 686.) She lives near an airport and is unable to move due to finances. (Tr. 646.)

B.    *Medical Evidence*

1.    **Dr. William A. Ankobiah - Internist**

Dr. William A. Ankobiah, an internist with the Rosedale Medical Office, first examined plaintiff on September 12, 2001, the day after her experience at the World Trade Center.  (Tr. 201-03, 225-26, 247-49.)  Plaintiff complained of anxiety and difficulty breathing.  (Tr. 201.) Examinations of the heart, abdomen, skin, spine, and upper and lower extremities were normal. (Tr. 202.)  Mild wheezing was found in the lungs.  (Tr. 202.)  Plaintiff was diagnosed with asthmatic exacerbation and post traumatic stress disorder ("PTSD").  (Tr. 202.)  The recommended treatment plan was for psychotherapy and a prescription for Buspar, an anti-anxiety medication.  (Tr. 203.)  In addition, Dr. Ankobiah's office notes dated through November 1, 2001 document that Plaintiff was prescribed various medications for her asthma and anxiety. (Tr. 231, 236, 238-48.)  In a letter dated October 15, 2001, Dr. Ankobiah indicated that Plaintiff "has been totally disabled from 09/11/2001 until present" and has been advised to "refrain from work activities until 12/12/2001."  (Tr. 257.)

2.    **Dr. Henry Beaulieu - Psychiatrist**

Dr. Henry Beaulieu first examined plaintiff on November 27, 2001.  (Tr. 434.)  (Tr. 321-323, 431-433).  His records reveal that he treated Plaintiff regularly for PTSD from November 2001 to late 2002, including prescribing anti-anxiety medication.  (Tr. 431-43.)  In a State workers' compensation board doctor report form dated October 23, 2002, Dr. Beaulieu opined that plaintiff was disabled due to PTSD.  (Tr. 435.)

3.    **Dr. Jean Claude-Compas - Psychiatrist**

Dr. Claude-Compas, a psychiatrist, performed a physical exam on May 13, 2002.  (Tr.

334-35.)  He noted that Plaintiff "was in distress but alert, responsive [and] oriented to time, place and person."  (Tr. 334.)  He diagnosed Plaintiff with PTSD and dyspnea [i.e., shortness of breath] secondary to exposure to dust and smoke" and prescribed anti-anxiety medication.  (Tr. 335.)  The record contains multiple workers' compensation doctor report forms signed by Dr. Compas, as well as "To Whom It May Concern" letters, spanning from November 28, 2001 through March 11, 2004.  These forms and letters note Plaintiff's complaints of depression, anxiety, mood changes, memory loss, headaches, and difficulty breathing, as well as Dr. Compas's diagnoses of PTSD, headaches, dyspnea, respiratory difficulties, depressive disorder, and smoke inhalation.  (Tr. 174-191, 195-196, 347, 349, 351-354, 356-363, 382-384, 386-388, 418, 420-421, 427.)  Dr. Compas repeatedly indicated that Plaintiff's prognosis was guarded and that she could not resume her work activities as of that time.  (*Id.*)

### 4.     Dr. Vilor Shpitalnik - Psychiatrist

Dr. Shpitalnik, a psychiatrist, examined plaintiff on June 17, 2002.  (Tr. 204-206.)  Plaintiff complained of "insomnia, depressed mood most of the day almost every day, [and] flashbacks with intrusive scenes of [September 11th]."  (Tr. 205.)  Dr. Shpitalni observed that Plaintiff was restless, sad, and apprehensive and that she "broke down in crying spells several times."  (Tr. 205.)  He also noted that although Plaintiff's cognitive functioning was alert and oreinted, her attention and concentration were "limited."  (Tr. 205.)  He diagnosed PTSD and asthma and indicated that she needed more psychiatric treatment.  (Tr. 206.)

### 5.     Dr. Yolette J. Williams – Psychotherapist

In a letter dated September 30, 2003, Dr. Williams reported that Plaintiff had been under the psychiatric care of Dr. Beaulieu, who became ill and died in April 2003.  (Tr. 444.)  Dr.

Williams indicated that although Plaintiff had attained positive results from Dr. Beaulieu's treatment, with whom she had "developed a good working alliance," she had currently "regressed a great deal emotionally," experiencing "generalized phobic reactions accompanied by startled responses." (Tr. 444.)  Dr. Beaulieu's death "presented a real set back" for Plaintiff, who could not even bring herself to the office for a couple of months.  (Tr. 444.)  Dr. Williams reported that Plaintiff had "moderate loss of memory [and] poor concentration and ability to focus."  (Tr. 444).  Dr. Williams also noted that Plaintiff "has difficulties performing routine tasks such as opening her mail, filling out forms, and paying her bills."  (Tr. 444.)

### 5.    Dr. Roger Rahtz - Psychologist

At the request of the Commissioner, psychiatrist Dr. Roger Rahtz examined Plaintiff on September 3, 2003.  (Tr. 120-121.)  Plaintiff reported no psychiatric hospitalizations, and was presently seeing a therapist, but was not on psychiatric medications.  (Tr. 120.)  She reported depression, insomnia, loss of interest and energy, social isolation, and poor concentration.  (Tr. 120.)  On mental status examination, plaintiff appeared anxious, and her speech was relevant and coherent.  (Tr. 120.)  Delusions and hallucinations were absent, but depressive and anxious preoccupations were present.  (Tr. 120.)  Plaintiff reported that she lived with her husband and spent her days reading or going to church.  (Tr. 120.) She did a few chores at home and had no social contacts.  (Tr. 120.)  Dr. Rahtz diagnosed PTSD with depressive and anxious symptoms. (Tr. 120.)  He opined that Plaintiff may benefit from medications.  (Tr. 120).

### 6.    Dr. Antonio L. De Leon - Internist

At the request of the Commissioner, internist Dr. Antonio De Leon examined plaintiff on September 3, 2003.  (Tr. 115-116.)  Plaintiff reported having asthma since 1999 with no

hospitalizations and was treating with various inhalers. (Tr. 115.) Plaintiff stated she had

coughing with shortness of breath four times per month. (Tr. 115.) She also reported PTSD,

depression, insomnia, and no suicidal ideation. (Tr. 115.) She traveled by bus for the

appointment, and reported she was able to walk one block. (Tr. 115.) Plaintiff reported that she

lived with her husband, shopped on her own, cooked, and spent the day on her computer. (Tr.

115.) Examination results were all within normal limits, including results of a pulmonary

function test. (Tr. 115-119.) Dr. De Leon opined that plaintiff was able to sit without limitation,

and her ability to walk, stand, carry, and lift were mildly limited due to asthma. (Tr. 116.)

### 7.     Dr. S. Bonete - State Agency Psychiatrist

State agency psychiatrist Dr. S. Bonete completed a Psychiatric Review Technique form

("PRTF") on September 30, 2003 (Tr. 132-145). He found no limitations in activities of daily

living or social functioning, and no episodes of decompensation.[2] (Tr. 142.) He found mild

limitations in maintaining concentration, persistence, and pace. (Tr. 142.) In a Mental Residual

Functioning Capacity ("RFC") assessment, Dr. Bonete found no significant limitations in most

areas of understanding and memory; sustained concentration and persistence; social interaction;

and adaptation. (Tr. 122-23.) He did find moderate limitations in ability to maintain attention

and concentration for extended periods; perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; and to set realistic goals or make

---

[2] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." (Tr. 575.)

independent plans.  (Tr. 122-124.)  Dr. Bonete opined in the RFC assessment that plaintiff was capable of working in a low stress setting.  (Tr. 124.)

### 8.    **Dr. Martha Abraham - Psychiatrist**

Dr. Martha Abraham, a psychiatrist, submitted a report dated March 11, 2004.  (Tr. 344). Dr. Abraham stated that Plaintiff reported anxiety, flashbacks, and difficulty concentrating.  (Tr. 344.)  Mental status examination was remarkable for severe anxiety.  (Tr. 344.)  Judgment was found to be good and Plaintiff seemed to have good insight into her condition.  (Tr. 344.)  Dr. Abraham opined that Plaintiff presented with "moderate - severe" PTSD, however, she maintained decisional capacity regarding settlement of her workers' compensation case.  (Tr. 344.)  In State workers' compensation board doctor report forms dated October 7, 2003 and March 11, 2004, Dr. Abraham opined that plaintiff was disabled due to PTSD.  (Tr. 412, 417.)

### 9.    **Dr. Carlos Tejera - Psychiatrist**

On May 13, 2004, Plaintiff met with Veronica Cruz, CSW and Ms. Cruz completed a "Behavioral Health Services" intake form and assigned Plaintiff a Global Assessment of Functioning ("GAF") of 50.[3]  (Tr. 471-79.)  Subsequently, Plaintiff was examined by psychiatrist Dr. Carlos Tejera on July 22, 2004.  (Tr. 154.)  Dr. Tejara noted that Plaintiff's attention and awareness was lethargic, and her thought process was normal.  (Tr. 157-58.)  He further reported that her mood was depressed.  (Tr. 159.)  Plaintiff's orientation, immediate recall and retention,

---

[3]      "The GAF is a [100-point] scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th ed. 2000)) (first alteration added).  A GAF of 51-60 is assigned to individuals with "[m]oderate symptoms . . . [or] moderate difficulty in social, occupational, or school functioning."  *Id.*

memory, fund of knowledge, concentration/attention, abstract versus concrete thought, cognitive ability, judgment, insight, and impulse control were all normal. (Tr. 159.) Dr. Tejara's primary diagnosis was PTSD and Plaintiff's GAF was listed as 55. (Tr. 161.)

In an August 31, 2005 report, Dr. Tejera again listed Plaintiff's GAF as 55. (Tr. 197.) He noted numerous symptoms including loss of interest in activities, lower energy, anxiety, difficulty concentrating, recurrent intrusive recollections of traumatic events, mood disturbances, apprehensive expectation, emotional withdrawal, vigilance, and sleep disturbance. (Tr. 198.) He found moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace. (Tr. 199.) He opined that Plaintiff's impairments would cause more than four absences from work per month. (Tr. 200.) He noted her current medications as Zoloft, Trazadone, and Xanax. (Tr. 207, 555.) He stated that Plaintiff had no useful ability to understand, remember, and carry out detailed instructions, or maintain concentration for extended periods. (Tr. 210, 558.) He also stated that she had no useful ability to accept instructions and respond appropriately to supervisors and changes in the work setting, get along with co-workers and peers, travel in unfamiliar places or use public transportation. (Tr. 210, 558.)

On another form also dated August 31, 2005, Dr. Tejera again noted Plaintiff's GAF to be 55. (Tr. 212, 560.) He also opined that Plaintiff was capable of performing light work on a regular and continuing basis. (Tr. 552.) He found moderate limitations in the ability to maintain concentration and attention, perform activities within a schedule, maintain regular attendance, and punctuality. (Tr. 553.) He found moderately severe limitations in her "ability to complete a normal workday and workweek without interruptions from medically based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest periods."  (Tr. 553.)  He stated that these limitations have lasted 12 continuous months or they can be expected to last for 12 continuous months.  (Tr. 554.)

In a March 15, 2006 report, Dr. Tejera opined that Plaintiff was "[u]nable to meet competitive standards" in the following areas:  maintaining attention for 2 hours; working in coordination with and proximity to others; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace; understanding and remembering simple instructions, carrying out detailed instructions, setting realistic goals or making plans independently; responding appropriately to changes in a routine work setting; dealing with stress at work; traveling in unfamiliar places and using public transportation.  (Tr. 573-74.)  He stated that Plaintiff was "[s]eriously limited, but not precluded" from:  remembering work procedures; understanding, remembering, and carrying out simple instructions; maintaining regular attendance; sustaining an ordinary routine; accepting instructions; and being aware of normal hazards.  (Tr. 573.)  He found moderate limitations in episodes of decompensation within a 12- month period.  (Tr. 575.) He found marked[4] limitations in maintaining social function and maintaining concentration, persistence, and pace.  (Tr. 575.)  A medication list covering the period of July 22, 2004 through February 2005 included the following:  Zoloft, Xanax, Advair, Singulair, and Lipitor.  (Tr. 170-73, 483-88.  A medication list covering the period of October 2005 through January 2006

---

[4] "Marked means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis."  (Tr. 575.)

included Xanax, Zoloft, and Trazadone. (Tr. 592-93.) Dr. Tejera's 2006 treatment records indicated that Plaintiff continued her medication, which was somewhat helpful, but that Plaintiff remained "very stressed." (Tr. 580.)

### 10. Dr. Akwasi Achampong - Internist

Dr. Achampong, an internist, treated plaintiff from November 4, 2003 through February 15, 2006. (Tr. 149-51, 292-93, 594-97.) In a March 18, 2005 report, Dr. Achampong noted that Plaintiff presented with complaints of persistent headaches, panic and anxiety attacks since September 11, 2001, and occasional shortness of breath. (Tr. 149.) She denied dizziness or chest pain. (Tr. 149.) Plaintiff was noted to be depressed, anxious, and very nervous. (Tr. 149.) Her current medications included Zoloft, Advair, Albuterol, and Xanax. (Tr. 149.) Dr. Acahmpong diagnosed depression and anxiety disorder since September 11, 2001, and recommended psychotherapy and pharmacotherapy. (Tr. 149.) He stated that Plaintiff was totally disabled and unable to concentrate for periods of time, but could follow simple instructions. (Tr. 149.) He opined that Plaintiff had no useful ability to understand, remember, and carry out short, simple instructions. (Tr. 150.) He stated that Plaintiff had no limitations in the ability to respond to supervision, co-workers, and work pressure in a work setting. (Tr. 149-50.) He opined that Plaintiff would need to take unscheduled breaks, and that she would be absent from work more than three times per month. (Tr. 150.)

On August 30, 2005, Dr. Achampong stated that Plaintiff was unable to work due to her lack of concentration, and her fear that something will happen to her. (Tr. 213.) With respect to her working ability, however, he opined that she could frequently lift 20 pounds, occasionally lift 20 pounds, and sit, stand, and walk for 6 hours. (Tr. 214.) He noted that stress did not play a

role in producing her symptoms.  (Tr. 215.)  He also opined that Plaintiff's symptoms frequently interfere with her attention and concentration.  (Tr. 215.)

### 11.  **Dr. Edward Halperin - Psychiatrist**

Medical expert Dr. Halperin testified at Plaintiff's supplemental hearing held on April 17, 2006.  (Tr. 701-40.)  Dr. Halperin testified that Plaintiff "obviously has post-traumatic stress disorder" (Tr. 706), and that although "[t]here's no denying" that Plaintiff suffered a trauma, "she was able to improve."  (Tr. 708.)  However, he later stated that although generally most PTSD patients experience less traumatic stress, it has taken a "very long time" for Plaintiff's trauma to disappear and "it seems to be unabated."  (Tr. 720.)  He also noted that Plaintiff "does not seem to have any plans for moving on."  (Tr. 721.)

Dr. Halperin initially opined that Plaintiff did not meet or equal a regulatory listing of impairments and that she would be able to perform at least low stress and moderately complicated work.  (Tr. 708-09.)  He later testified that "in terms of the A criteria she does meet" a listing, but with respect to "the B [criteria]" he thought "she does have more in the way of particular strengths and abilities."  (Tr. 738-39.)  Dr. Halperin testified that every treating physician Plaintiff saw diagnosed her with PTSD and that Plaintiff received consistent treatments since September 11, 2001.  (Tr. 710.)  He also noted that Plaintiff has a "medically-documented finding of generalized persistent anxiety" (Tr. 721), and a persistent irrational fear of a specific activity or situation which results in a compelling desire to avoid it.  (Tr. 723.)  He agreed that Plaintiff has current severe panic attacks but noted that there was "no sense of her ever going to hospital emergency rooms" and stated that he did not see evidence of panic attacks occurring as often as once per week.  (Tr. 723.)  He later acknowledged, however, that Dr. Tejera's March

2006 report noted that Plaintiff suffered from severe panic attacks on the average of at least once a week.  (Tr. 733, 572.)  He also testified that Plaintiff did have "current obsession to compulsions which are the source of marked distress" and "current or intrusive recollections of traumatic experience."  (Tr. 724.)

Dr. Halperin opined that Plaintiff's limitations result in a "moderate restriction of daily living."  (Tr. 724.)  He defined moderate as including Plaintiff's ability to perform some of the activities of daily living, including the ability to get to her doctors' appointments and shop at stores.  (Tr. 724.)  Dr. Halperin also opined that Plaintiff has a "moderate" difficulty in maintaining social functioning but that she was "socially competent at a certain level."  (Tr. 725-26.)  He noted that Plaintiff has contact with her sister-in-law and was able to negotiate her legal claim, which would have required a "certain amount of interaction" with her attorney, and has a recognition of having to pay her debts.  (Tr. 725-26, 740.)  Dr. Halperin did not find that Plaintiff had "marked" difficulty in social functioning, which he described as "approach[ing]" an inability to leave the house.  (Tr. 725, 739.)

When asked about Plaintiff's difficulties in "maintaining concentration, persistence or pace," Dr. Halperin noted Plaintiff's ability to focus on recovering workers' compensation benefits and her desire to pay off her debts and establish good credit.  (Tr. 726, 740.)  Finally, Dr. Halperin stated that Dr. Tejera's finding that Plaintiff had a "marked" limitation in this area was "an exaggeration."  (Tr. 727.)

C.    *Testimony of Mark Ramnauth – Vocational Expert ("VE")*

During the September 20, 2005 hearing, the ALJ asked VE Mark Ramnauth to describe "the nature of [Plaintiff's] prior work experience," as well as, for each position she held, to set

forth "the SVP value, the skills level, [and] the transferability of said skills to moderate and low stress jobs, if any." (Tr. 741.)[5] Mr. Ramnauth described the positions previously held by Plaintiff as follows: (1) Plaintiff's computer position was light and skilled with an SVP of six, under the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") Code 213.362-010; (2) Plaintiff's inspector position was light and skilled with an SVP of six under DOT Code 168.267-042; (3) Plaintiff's technical trainer position was light with an SVP of eight under DOT Code 166.221-010; (4) Plaintiff's data entry operator position was sedentary with an SVP of four under DOT Code 203.582-054; and (5) Plaintiff's office clerk position was light and semi-skilled with an SVP of four under DOT Code 219.362-010. (Tr. 743.) He stated that all of Plaintiff's prior positions involved moderate to moderate complex tasks with the following transferable skills: extensive clerical skills, computer operations, writing skills, and communication skills. (Tr. 744.)

Mr. Ramnauth testified that these skills would be transferable to jobs requiring simple, repetitive tasks such as: (1) File Clerk, DOT Code 206.387-034, which involves light duty clerical work with an SVP of three (10,000 jobs locally, 500,000, nationally) (Tr. 744-45); (2) Check Cashier, DOT Code 211.146-026, which is sedentary with an SVP of 3 (3,000 jobs locally, 200,000 nationally) (Tr. 745); (3) Time Keeper, DOT Code 215.363-0222, which is sedentary with an SVP of three (5,000 jobs locally, 190,000 nationally) (Tr. 745); and (4) Food

_____

[5]     Specific Vocational Preparation ("SVP") is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. Dictionary of Occupational Titles, 4th ed. revised 1991), Appendix C. Using the skill level definitions in 20 C.F.R. § 404.1568, unskilled work corresponds to an SVP of 1-2; semiskilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9. Social Security Ruling ("SSR") 00-4p.

Preparer, DOT Code 211.482-014, which is sedentary with an SVP of three (4,000 jobs locally, and 130,000 nationally) (Tr. 757-59).

On cross-examination, the VE stated that the File Clerk and Time Keeper jobs required low contact with others, while the Check Cashier required high contact. (Tr. 750.) He stated that the File Clerk job would typically involve completing a certain amount of files per hour in a day (Tr. 752), a Check Cashier would have an average amount of customers per hour, and a Time Keeper would have deadlines based on the frequency of payroll (Tr. 752-53).

### DISCUSSION

**I.** **Legal Standards**

**A.** **Review of the ALJ's Decision**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted). Thus the only

issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.

**B.** ***Eligibility for Disability Benefits***

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to

perform his past work. Finally, if the claimant is unable to perform
his past work, the [Commissioner] then determines whether there
is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per

curium)). The claimant bears the burden of proof at steps one through four, while the burden

shifts to the Commissioner at step five to show that the claimant is capable of working.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

###    C.    *The Treating Physician Rule*

Social Security regulations require that an ALJ give "controlling weight" to the medical

opinion of an applicant's treating physician so long as that opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*,

168 F.3d at 78-79. The "treating physician rule" does not apply, however, when the treating

physician's opinion is inconsistent with the other substantial evidence in the record, "such as the

opinions of other medical experts." *Hallora*n, 362 F.3d at 32; *see also Veino v. Barnhart*, 312

F.3d 578, 588 (2d Cir. 2002). When the treating physician's opinion is not given controlling

weight, the ALJ "must consider various 'factors' to determine how much weight to give to the

opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include:

(1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the

treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4)

whether the treating physician is a specialist; and (5) other factors that are brought to the

attention of the Social Security Administration that tend to support or contradict the opinion. 20

C.F.R. § 404.1527(d)(2)(i-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when

giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barnhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001)), *amended on other grounds on rehearing*, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is

disabled." 20 C.F.R. §§ 404.1512(e), (e)(1). The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source." Id. § 404.1512(e)(1). The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings." Id. § 404.1512(e)(2). If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id*. § 404.1512(f).

## II. *The ALJ's Decision*

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff satisfied the first two steps, to wit: (1) Plaintiff had not engaged in substantial gainful activity since September 11, 2001; and (2) Plaintiff has PTSD, a severe impairment. The ALJ concluded that Plaintiff did not meet the third step, however, because her impairment did not meet or equal in severity any impairment in the Listing of Impairments, Appendix 1, Subpart P, Part 404 of the Regulations. The ALJ next found under the fourth factor that Plaintiff's impairment precluded performance of her past relevant work, which required the completion of complex duties.

Once the ALJ determined that Plaintiff was not able to perform her past relevant work, the ALJ proceeded to the fifth and final step, viz., determining whether the Commissioner had established that there was other work Plaintiff could have performed. The ALJ found that Plaintiff has the "Residual Functional Capacity to perform low stress, moderately complicated work that involves simple, repetitive tasks." (Tr. 32.) According to the ALJ, examples of such

occupations include "File Clerk," "Check Cashier," and "Timekeeper." (Tr. 33.)

After the five-step analysis was completed, the ALJ determined that Plaintiff was not disabled under the SSA. (Tr. 33).

## III.   *The Parties' Arguments*

Plaintiff sets forth numerous objections to the ALJ's decision. First, Plaintiff asserts that "the ALJ committed reversible error . . . by not following the mandatory 'special technique' set forth in 20 C.F.R. § 404.1520a for evaluating the severity of a mental impairment, and that [the Court cannot] conclude from the record that this error was harmless." (Pl.'s Mem. at 12.) Second, Plaintiff contends that the ALJ improperly failed to afford controlling weight to the opinion of Dr. Tejara, Plaintiff's treating physician. (*Id.* at 14-23.) Next, Plaintiff argues that "the ALJ's failure to include any concentration limitations in his RFC assessment is reversible error." (*Id.* at 24.) Finally, Plaintiff asserts that the Commissioner failed to sustain his burden of establishing that there is other work in the national economy that Plaintiff can perform. (*Id.* at 26.)

## IV.   *The ALJ Improperly Evaluated Plaintiff's Mental Impairments*

Plaintiff asserts that although the ALJ determined that Plaintiff's PTSD was "a severe impairment," the ALJ "committed reversible error in not making an[y] findings regarding the four required regulatory factors as set forth in 20 C.F.R. § 404.1520a. (*Id.* at 12 (citing *Kohler v. Astrue*, 546 F.3d 260 (2d Cir. 2008).)

In *Kohler*, the Second Circuit reviewed the additional regulations promulgated by the Commissioner of Social Security that govern evaluations of the severity of mental impairments. 546 F.3d at 265-66 (citing 20 C.F.R. § 404.1520a). These additional regulations "require

application of a 'special technique' at the second and third steps of the five-step framework." *Id.* at 265 (citing 20 C.F.R. § 404.1520a(a)). Pursuant to this "special technique," "the reviewing authority [must] determine first whether the claimant has a 'medically determinable mental impairment.'" *Id.* at 266 (citing 20 C.F.R. § 404.1520a(b)(1)). "If the claimant is found to have such an impairment, the reviewing authority must 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),' [ ] which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id.* (quoting 20 C.F.R. § 404.1520a(b)(2); citing 20 C.F.R. § 404.1520a(c)(3)).

"[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, than the reviewing authority generally will conclude that claimant's mental impairment is not 'severe' and will deny benefits." *Id.* (citing 20 C.F.R. § 404.1520a(d)(1)). "If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. *Id.* (citing 20 C.F.R. § 404.1520a(d)(2)). "If so, the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's residual functional capacity." *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

The Second Circuit has emphasized the regulations' requirement that the "application of this process be documented." *Id.* (citing 20 C.F.R. § 404.1520a(e)). "At the initial and reconsideration levels of administrative review, a medical or psychological consultant generally will complete a standard document known as a Psychiatric Review Technique Form ("PRTF")."

*Id.* (citing 20 C.F.R. § 404.1520a(e)(1)). Although an ALJ is not required to fill out a PRTF, the regulations "do require the ALJ's written decision to reflect application of the technique, and explicitly provide that the decision '*must* include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.'" *Id.* (citing 20 C.F.R. § 404.1520a(e)(2), (c)(3)) (emphasis in the original).

Plaintiff asserts that "[d]espite finding that Mrs. Day has [PTSD], which is a severe impairment, [the ALJ] <u>never</u> analyzed the four factors set forth in the regulations in that he failed to make findings regarding the frequency of any deficiencies of concentration, the impact of Mrs. Day's PTSD on her social functioning or her daily activities, or whether she had ever experienced episodes of decompensation." (Pl.'s Mem. at 13.) Defendant asserts that the ALJ "cited to" the PRTF completed by Dr. Bonete, "which found no limitations in activities of daily living, or social functioning, and no episodes of decompensation," and which found "only mild limitations in maintaining concentration, persistence, or pace." (Def.'s Reply at 2 (citing Tr. 142).) Defendant further contends that Dr. Bonete's findings "are further supported by the testimony of impartial medical expert Dr. Edward Halperin." (*Id.*) According to Defendant, therefore, the ALJ "indeed made findings with regard to the degree of limitation in each of the functional areas set forth in 20 C.F.R. § 404.1520a(c)(3)." (*Id.*)

In his decision, the ALJ states that he "considered the findings made by the state agency medical consultants," which were "consistent with Dr. Halperin's testimony." (Tr. 31.) Referring to the PRTF completed by Dr. Bonete, the ALJ states that "[t]he state agency reports make note of normal findings in regard to limitations on daily activity, social functioning, decompensation . . . [and] only mild findings in regard to maintaining concentration, persistence

or pace . . . ." (*Id.*) The PRTF itself simply lists the four functional areas with corresponding check-boxes that note the degree of limitation – there is no explanation or discussion as to the boxes checked by Dr. Bonete. (Tr. 142.) Elsewhere in his decision, the ALJ states: "[C]learly, the claimant retains the ability to do such things as handle finances, take public transportation, engage in litigation strategy with her lawyer and monitor the progress of her case, prepare some meals, do household chores, and go to church." (Tr. 30.)

The Court finds that the ALJ did not comply with the regulations by failing to document his use of the "special technique" to evaluate the severity of Plaintiff's PTSD. The ALJ stated simply that he "considered" (rather than adopted) the findings set forth in the PRTF. Moreover, while listing the activities the ALJ found Plaintiff capable of completing, the ALJ did not provide any analysis or specific findings as to each of the four functional areas set forth in 20 C.F.R. § 404.1520a(c)(3). *Compare Duell v. Astrue*, 2010 WL 87298, at *7 (N.D.N.Y. Jan. 5, 2010) (finding ALJ failed to comply with regulations when "there is no indication in the ALJ's decision that he made findings regarding a Plaintiff's degree of limitation in the four areas"); *Holland v. Comm'r of Soc. Sec.*, 2009 WL 3790190, at *4 (N.D.N.Y. Nov. 12, 2009) (finding ALJ failed to comply with regulations when he relied on a doctor's conclusions, but neither ALJ's decision nor doctor's report contained any "discussion of the rate or degree of functional limitations resulting from plaintiff's impairment") *with Comins v. Astrue*, 374 Fed. Appx. 147, 150 (2d Cir. Apr. 15, 2010) (finding ALJ complied with regulations when decision "specifically expounded upon each of the four functional areas of the special technique" and "[b]olstered by evaluations from a variety of medical personnel . . . he carefully laid out the limitations [plaintiff] would be expected to have in each area").

The Second Circuit examined "[t]he consequence of noncompliance with 20 C.F.R. §
404.1520a" as "a matter of first impression" in *Kohler*. 546 F.3d at 266. The court noted that
other courts of appeals "have not hesitated to remand where an ALJ's noncompliance with 20
C.F.R. § 404.1520a results in an inadequately developed record with respect to the four
functional categories." *Id.* at 266-67. Because the *Kohler* court could "neither identify findings
regarding the degree of Kohler's limitations in each of the four functional areas nor discern
whether the ALJ properly considered all evidence relevant to those areas," the court could not
"determine whether the ALJ's decision . . . is supported by substantial evidence and reflects
application of the correct legal standards." *Id.* at 269.

As one district court recently noted: "Since *Kohler*, virtually every court in this Circuit
that has encountered this issue . . . has reversed and remanded the matter to the Commissioner for
further proceedings." *Concepcion v. Astrue*, 2010 WL 2723184, at *11 (D.Conn. July 8, 2010)
(collecting cases) (remanding when ALJ did not address "special technique" or make any
findings as to plaintiff's functional limitations in four areas); *see also Duell*, 2010 WL 87298 at
*9 (remanding); *Holland*, 2009 WL 3790190 at *4 (same).

The Second Circuit in *Kohler* did "leave open the possibility that an ALJ's failure to
adhere to the regulations' special technique might under other facts be harmless." *Kohler*, 546
F.3d at 269. At least one district court within the Circuit has indeed declined to remand in the
face of the ALJ's failure to comply with the regulations based upon a finding that such failure
was harmless error. *See Arguinzoni v. Astrue*, 2009 WL 1765252, at *8 (W.D.N.Y. June 22,
2009) (finding remand "not appropriate" to correct ALJ's "procedural error" in failing to record
specific findings as to plaintiff's limitations in four functional areas given that it was clear that

"the ALJ would have arrived at the same conclusion . . . if he adhered to the regulations" and "the medical opinion evidence . . . supports the Commissioner's [ ] determination").

Here, despite the ALJ's finding that Plaintiff could "handle finances, take public transportation, engage in litigation strategy with her lawyer and monitor the progress of her case, prepare some meals, do household chores, and go to church" (Tr. 30), there is also record evidence that the ALJ did not address, *inter alia*: Plaintiff's report that she had trouble sleeping and could not focus or concentrate (Tr. 622); Plaintiff's report that she has panic attacks at least once per week during which she, *inter alia*, has bowel movements, loses control of her legs and feels faint (Tr. 647); Dr. Shpitalnik's report that Plaintiff's attention and concentration were "limited" (Tr. 205); Dr. Williams' report that Plaintiff "regressed a great deal emotionally" following Dr. Beaulieu's death, experiencing "generalized phobic reactions accompanied by started responses," and could not bring herself to her doctor's office for a couple of months (Tr. 444); Dr. Williams' report that Plaintiff had "moderate loss of memory [and] poor concentration and ability to focus" (Tr. 444); Dr. Bonete's findings of moderate limitations in Plaintiff's ability to maintain attention and concentration for extended periods of time, perform activities on a schedule, maintain regular attendance, be punctual within customary tolerance, set realistic goals, and make independent plans (Tr. 122-24); and Dr. Achampong's reports that Plaintiff was unable to concentrate for periods of time, had no useful ability to understand, remember, and carry out short, simple instructions, was unable to work due to her lack of concentration, and her fear that something will happen to her (Tr. 149, 150, 213).[6]

---

[6] This list does not include the evidence from Dr. Tejera's records, which was not considered by the ALJ for the reasons set forth below.

Given this evidence, the Court cannot conclude that the ALJ "actually complied with the special technique by making determinations regarding Plaintiff's degree of limitation" such that his mere failure to document the special technique would constitute harmless error. *See Duell*, 2010 WL 87298 at *7 ("In light of the evidence of record indicating Plaintiff suffered from limitations in each of the functional areas, the ALJ's failure to apply the special technique is error.") Moreover, given the evidence cited above that was not included in the ALJ's decision, the Court cannot conclude that "the ALJ would have arrived at the same conclusion . . . if he adhered to the regulations." *Arguinzoni*, 2009 WL 1765252 at *9 (finding ALJ's failure to document "special technique" analysis did not require remand when medical opinion evidence supported ALJ's determination and ALJ "conducted a sufficient analysis to permit adequate review on appeal in this case").

Accordingly, this case is remanded to the Commissioner for further development of the record and appropriate application and documentation of the "special technique" set forth at 20 C.F.R. § 404.1520a.

## V.    *The ALJ Failed to Properly Apply the Treating Physicians Rule*

The ALJ determined that "[w]hile the treating physicians' opinions are considered, they lack the probative value which would afford them controlling weight." (Tr. 32.) In discussing Dr. Tejera, the ALJ stated that "[w]hen presented with the medical reports of Dr. Tejera, Dr. Halperin maintained that this reporting was imprecise, insofar as upgrading the claimant from moderate to marked without specifying the indicators that would account for such a determination." (Tr. 31.) Overall, the ALJ found that: "With only self-serving statements and conclusory medical evidence in support [of] the appropriate Section 12.06B criteria, a finding

that the claimant's condition meets or medically equals a listing cannot be supported . . . ."  (Tr. 32.)

Plaintiff contends that the ALJ's finding that Dr. Tejara "changed his opinion regarding the severity of Mrs. Day's mental impairment without explanation . . . is based on an apparent misreading of Dr. Tejara's assessments, which are reflected on different forms with differing definitions."  (Pl.'s Mem. at 15.)  On a form entitled "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment," which was completed by Dr. Tejera on August 31, 2005, he indicated that Plaintiff had "moderate" limitations on her ability to "maintain attention and concentration for extended periods" and "perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances."  (Tr. 553.)  On March 15, 2006, by contrast, Dr. Tejera completed a "Mental Impairment Questionnaire" that rated Plaintiff as having "marked" limitations in the functional areas of activities of daily living, social functioning, and concentration, persistence or pace.  (Tr. 575.)  However, a close examination of the definitions of "moderate" and "marked" as used on the August 2005 form and March 2006 forms, respectively, reveals that the terms have almost identical definitions. (*Compare* Tr. 553 (defining "moderate" as a "limitation which *seriously interferes* with the individual's ability to perform the designated activity on a regular and *sustained basis*, i.e., 8 hours a day, 5 days a week"), *with* Tr. 575 (defining "marked" as a limitation that "*seriously interferes* with the ability to function independently, appropriately, effectively, and on a *sustained basis*") (emphases added).)

Defendant asserts that on August 31, 2005 Dr. Tejera completed a "Mental Impairment Questionnaire" that rated Plaintiff's limitations as only "moderate" in the functional areas of

daily living, social functioning, and concentration, persistence or pace. (Tr. 563.) In his March

15, 2006 "Mental Impairment Questionnaire," however, he increased Plaintiff's limitation to a

"marked" rating. (Tr. 575.) Defendant argues that this aberration from Dr. Tejera's prior

"moderate" ratings explains the ALJ's refusal to afford controlling weight to Dr. Tejera's

opinion. (*See* Def.'s Reply at 4.) The Court notes, however, that on March 15, 2006 Dr. Tejera

identified Plaintiff's exhibition of numerous new symptoms that were not present on August 31,

2005, including: paranoid thinking or inappropriate suspiciousness, persistent irrational fear of a

specific object/activity/situation, hallucinations, and recurrent or severe panic attacks. (Tr. 572.)

Thus, the Court does not find substantial evidence to support the ALJ's conclusion that Dr.

Tejera "upgrad[ed]" Plaintiff from moderate to marked "without specifying the indicators that

would account for such a deterioration." (Tr. 31.)

Moreover, "[w]hen a treating physician's opinion is not given 'controlling' weight, the

regulations require the ALJ to consider several factors in determining how much weight it should

receive." 20 C.F.R. § 404.1527(d)(2); *Burgess*, 537 F.3d at 129. The ALJ must consider:

> The length of the treatment relationship and the frequency of
> examination; the nature and extent of the treatment relationship;
> the relevant evidence…, particularly medical signs and laboratory
> findings, supporting the opinion; the consistency of the opinion
> with the record as a whole; and whether the physician is a
> specialist in the area covering the particular medical issues.

*Id.* § 404.1527(d)(2)(i)-(ii), (3)-(5). Therefore, the more frequently the treating physician has

treated and consulted with the claimant, the more weight the Commissioner will give to the

opinion of the treating source. *Burgess*, 537 F.3d at 129. The Commissioner must then consider

the above factors and make a determination as to the weight to be assigned to the opinion of the

treating physician.  *Id*.  "Failure to provide such good reasons for not [] crediting the opinion of a claimant's treating physician is a ground for remand." *Id*. at 130; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

In the instant case, the ALJ failed to set forth a sufficient analysis.  He failed to explain his reasons for finding that the treating source opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques or were inconsistent with substantial evidence.  He did not identify the inconsistencies between the treating sources opinions and the other medical evidence in the record.  Finally, he failed to consider what weight to give to the treating sources' opinions using the factors listed in 20 C.F.R. § 404.1527(d).  The ALJ's failure to follow the treating physician rule is a failure to apply the proper legal standard and is grounds for reversal.  *See, e.g., Speruggia v. Astrue*, 2008 WL 818004 at *9 (E.D.N.Y. Mar. 26. 2008).

## VI.    *The ALJ Failed to Properly Consider Plaintiff's Subjective Testimony*

Plaintiff contends that "it is apparent that the ALJ was under the mistaken impression that a claimant's symptoms, as reported to a treating psychiatrist, cannot form the basis of a disability determination."  (Pl.'s Mem. at 19.)  An ALJ may consider a claimant's subjective testimony regarding her symptoms in determining whether she is disabled as required by Social Security regulations.  *See* 20 C.F.R. § 404.1529(a).  An ALJ should compare subjective testimony regarding the frequency and severity of symptoms to objective medical evidence.  *Id.* § 404.1529(b).  If a claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to "great weight."  *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992).  However, if a claimant's symptoms suggest a greater severity of impairment than can be demonstrated by the objective medical evidence, additional factors must be considered.  *See* 20

C.F.R. § 404.1529(c)(3). These include daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms. *Id*.

In addition, SSR 96-7p provides in pertinent part:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, *available at* 1996 WL 374186 (July 2, 1996). Absent such findings, a remand is required. *See, e.g.*, *Schultz v. Astrue*, 2008 WL 728925, at *12 (N.D.N.Y. Mar. 18, 2008).

Here, the ALJ determined that: "After considering the evidence of record, the undersigned finds . . . that the claimant's statements concerning the intensity, persistence and limiting effects of [her PTSD] symptoms are not credible." (Tr. 32.) The ALJ failed, however, to make the requisite findings of the "specific reasons for the finding on credibility," as described above. *See* SSR 96-7p. Therefore, remand is required.

**VII.   *The Hypothetical Posed by the ALJ to the VE Was Insufficient***

Plaintiff contends that, despite the existence of record evidence of Plaintiff's concentration limitations, the ALJ erred by failing to include that functional limitation in the hypothetical posed to the vocational expert. (Pl.'s Mem. at 24-26, 28.) Indeed, Plaintiff asserts that the ALJ entirely failed to pose a proper hypothetical question to the VE, which question

should have included Plaintiff's "age, education and past work experience as well as her functional limitations as supported by the record." (*Id.* at 28.) Plaintiff asserts that the ALJ merely asked the VE to list examples of jobs which involve simply, repetitive tasks. (*Id.*)

The ALJ posed the following hypothetical question to the VE:

> Mr. Ramnauth, you are a Vocational Expert maintained on a panel of such experts by the Bureau of Hearings and Fields, you've read the record, you've heard the testimony. I want you to tell me the nature of this lady's prior work experience, the SVP value, the skills level, the transferability of any said skills to moderate and low stress jobs, if any.

(Tr. 741.)

"The ALJ must pose hypothetical questions to the [VE] which reflect the full extent of the claimant's capabilities and impairments to provide a sounds basis for the [VE's] testimony." *Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 449 (S.D.N.Y. 2004). "This should include 'a complete picture of [a] plaintiff's . . . abilities' so that the vocational expert can 'accurately determine whether [the] plaintiff could engage in certain vocations." *Vernon v. Astrue*, 2008 WL 5170392, at *25 (S.D.N.Y. Dec. 9, 2008) (quoting *Matthews v. Barnhart*, 220 F. Supp. 2d 171, 175 (W.D.N.Y. 2002)) (alterations in the original).

Here, the ALJ failed to pose a hypothetical question to the VE that "incorporated Plaintiff's mental impairments and their effects on [Plaintiff's] social functioning, concentration, persistence, and pace." *Id.* It was not enough for the ALJ to simply state that the VE "heard the testimony" presented during the September 20, 2005 hearing, especially considering that a supplemental hearing was held on April 17, 2006. Therefore, on remand, the ALJ is directed to "account for the full range of Plaintiff's physical and mental impairments in questioning the

vocational expert." *Id.*

## VII.    *The ALJ's Step Five Determination*

Plaintiff argues first that the ALJ "failed to identify [Plaintiff's] acquired work skills and the specific jobs to which they transfer, as required by Social Security Ruling 82-41." (Pl.'s Mem. at 27.) Contrary to Plaintiff's assertion, however, the ALJ did identify, through the VE's testimony, that Plaintiff had "extensive clerical skills, computer operations skills, writing skills, and communication skills," all of which "are transferable." (Tr. 32.) Moreover, the ALJ cites the VE's testimony that "identified three occupations which consist of performing simple, repetitive-type tasks for which claimant might be well suited": File Clerk, Check Cashier, and Timekeeper. (Tr. 33.)

Plaintiff asserts, however, that "[t]he VE's testimony that an individual who is limited to 'simple repetitive-type tasks' could perform the jobs identified is inconsistent with the [Dictionary of Occupational Titles ("DOT")]." (Pl.'s Mem. at 29.) Social Security Ruling 00-4P sets forth that the Commissioner will "take administrative notice of 'reliable job information' available from various publications, including the DOT." SSR 00-4P, *available at* 2000 WL 1898704, at 2 (Dec. 4, 2000). In addition, VEs may be utilized "as sources of occupational evidence in certain cases." *Id.* "Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT." *Id.* In the event of a conflict between the two, "the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." *Id.* During the hearing, "as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such

32

consistency." *Id.*

Plaintiff asserts that the ALJ "failed to ask the VE whether his testimony was consistent with the DOT, as required." (Pl.'s Mem. at 30.) Moreover, according to Plaintiff, a conflict did exist. According to the DOT, the three jobs suggested by the VE "all have a reasoning level of '3,'" but "only reasoning level '1' jobs can be performed by an individual who can understand and carry out simple instructions." (*Id.* at 29.) Defendant argues that "the ALJ found that plaintiff retained the RFC not just for simple, repetitive work, but for work that was low stress and moderately complicated." (Def.'s Reply at 7.)

Although the ALJ stated that Plaintiff retained the RFC for work that was "low stress and moderately complicated," the ALJ's decision also references Plaintiff's ability to "perform[ ] simple, repetitive-type tasks." (Tr. 32.) Accordingly, on remand the ALJ is directed to comply with the provisions set forth in SSR 00-4P, as described above.

## Conclusion

For all of the reasons stated above, this case is remanded for further administrative proceedings consistent with this opinion. The Clerk of the Court is directed to close this case.

**SO ORDERED**.

Dated:   Central Islip, New York
         April 18, 2011

                                        /s /_____
                                        Denis R. Hurley
                                        United States District Judge